# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CHRIS WRIGHT, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 22-1378 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 38, 40 |
| | : | | |
| U.S. DEPARTMENT OF HEALTH AND | : | | |
| HUMAN SERVICES, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING THE HHS'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING WRIGHT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

In this Freedom of Information Act ("FOIA") action, the U.S. Department of Health and Human Services ("HHS" or "Defendant") seeks partial summary judgment, arguing that it and its component agency, the Center for Disease Control and Prevention ("CDC"), have met all legal obligations in responding to Chris Wright's ("Wright" or "Plaintiff") request for records related to Vaccine Adverse Event Reporting System ("VAERS") COVID-19 vaccine adverse reaction reports. HHS contends that it conducted a reasonable and adequate search, properly applied FOIA Exemptions 5 and 6, and released all segregable, non-exempt information. Proceeding *pro se*, Wright's FOIA request sought decision memos, studies, and communications concerning vaccine-related mortality. In response, the CDC and HHS performed various searches across multiple offices and custodians. Several responsive records were released, while others were withheld or redacted based on FOIA exemptions. In its motion for partial summary judgment, HHS requests the Court to affirm the adequacy of its search and the validity of its withholdings; while in his cross-motion for partial summary judgment, Wright argues that HHS has neither

conducted an adequate search nor sufficiently explained its search efforts, and that additional documents remain that could be released.  For the foregoing reasons, HHS's motion for partial summary judgment is granted and Wright's cross-motion for partial summary judgment is denied.

## II.  FACTUAL BACKGROUND

This action stems from a FOIA request submitted by Wright on November 12, 2021, seeking several categories of records related to adverse reactions to COVID-19 vaccines. Specifically, Wright requested:

> 1) Decision memo(s) or other records regarding further studies of [Vaccine Adverse Event Reporting System] COVID vaccine adverse reaction reports, setting forth the decision(s) and underlying rationale(s).
> 2) Any and all further studies of adverse reactions to COVID vaccines that have been conducted.
> 3) Any and all records discussing adverse reactions to COVID vaccines after the decision memo(s).
> 4) Any and all records previously released under same or similar FOIA requests.

Def.'s Statement of Material Facts Not in Genuine Dispute ("Def.'s Stmt.")  ¶ 1, ECF No. 38-1; Decl. of Alesia Y. Williams ("Williams Decl."), Ex. A, ECF No. 38-3.  The CDC acknowledged the request on November 16, 2021, and placed it in its complex processing queue.  Def.'s Stmt. ¶¶ 2–3; Decl. of Roger Andoh ("Andoh Decl.") ¶ 5, ECF No. 38-5.  Wright then revised the third item in the request to specifically target records analyzing mortality as a vaccine adverse reaction.  He instructed the CDC to use search terms including "death," "dying," "dead," "kill," and "murder," among others.  Def.'s Stmt. ¶ 4; Andoh Decl. ¶¶ 17–18.

The CDC, through its Immunization and Safety Office ("ISO")—a division of the National Center for Emerging and Zoonotic Infectious Diseases—conducted searches for the requested documents.  The CDC explained that the ISO is responsible for monitoring vaccine safety and therefore was the appropriate entity to conduct the search.  *See* Def.'s Stmt. ¶ 5;

Andoh Decl. ¶ 6.  Regarding Item 1, the CDC stated that it does not produce decision memos and therefore had no responsive documents, but it provided links to standard operating procedures and vaccine safety studies.  *See* Andoh Decl. ¶ 11; Def.'s Stmt. ¶ 8.  For Item 2, the CDC searched and shared links to all publicly available COVID-19 studies.  *See* Andoh Decl. ¶ 12; Def.'s Stmt. ¶ 8.  Following the revised request for Item 3, the CDC provided links to responsive public records using the mortality-related search terms.  *See* Andoh Decl. ¶ 19; Def.'s Stmt. ¶ 8. For Item 4, a search of the FOIA inbox within the relevant CDC division produced thirteen responsive documents, which were subsequently released to Wright.  *See* Andoh Decl. ¶ 14; Def.'s Stmt. ¶ 8.

After Wright filed a motion to compel in July 2023, the CDC expanded its search related to Item 1 by conducting an enterprise search of the Microsoft Outlook account of Dr. John Su, who was identified as the team lead for VAERS and Deputy Director of the ISO.  *See* Def.'s Stmt. ¶ 6; Andoh Decl. ¶¶ 23–24.  The CDC used specific search terms—such as "concept proposals and COVID-19 and VAERS"—and located thirty-six pages of documents.  Andoh Decl. ¶¶ 23, 26.  Thirteen pages were partially redacted, six pages were withheld entirely, and the rest were released in full.  Andoh Decl. ¶¶ 23–27; *see also* CDC Vaughn Index, ECF No. 38-6. The CDC also asked two additional officials—the Chief Medical Officer and the Incident Manager of the Coronavirus and Other Respiratory Viruses Division—to search their emails and shared drives for relevant documents.  Andoh Decl. ¶ 25; Def.'s Stmt. ¶ 7.  This additional effort did not result in any responsive records.  *Id*.

In addition to the CDC's efforts, HHS itself conducted a search through the Office of the Chief Information Officer ("OCIO") within the Office of the Secretary.  In response to Wright's motion to compel, HHS identified the OCIO as a potential source for responsive records.  Def.'s

Stmt. ¶ 10; Williams Decl. at 3, ECF No. 38-2.  On April 23, 2024, HHS directed the OCIO to

perform a search of the agency's email enterprise for emails from key custodians: Secretary

Xavier Becerra, Deputy Secretary Andrea Palm, and Chief of Staff Sean McCluskie.  Williams

Decl. at 3–4.  These individuals were selected based on their likely involvement in discussions

regarding VAERS COVID vaccine adverse reaction reports.  *Id.*  The search used the terms

"Proposal AND COVID AND VAERS" and was limited to emails from December 14, 2020

through November 11, 2021, which aligned with the time frame specified in Wright's FOIA

request.  *Id.*  This search yielded a total of 1,632 pages of documents that were initially deemed

potentially responsive.  *Id.*  Upon review by the HHS FOIA Office, only 25 pages were deemed

fully responsive to Wright's request, and these were released in full.  *Id.*  The remaining 1,607

pages were deemed unresponsive, meaning they did not contain relevant information related to

adverse reactions to COVID vaccines or related decision memos and studies.  *Id.*  A final

decision letter, along with the 25 responsive pages, was sent to Wright on September 12, 2024.

*Id.* at Ex. B, ECF No. 38-4.  This letter communicated the results of the search and provided the

requested documents.  *Id.*; Def.'s Stmt. ¶¶ 10–12.

### III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must support the

assertion that no facts are in dispute by "citing to particular parts of materials in the record,

including . . . affidavits or declarations."  Fed. R. Civ. P. 56(c)(1)(A).

In a FOIA case, where the adequacy of an agency's search is questioned, the Court may

grant summary judgment based on information provided in "[a] reasonably detailed affidavit,

setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). Such agency affidavits attesting to a reasonable search "are afforded a presumption of good faith," and "can be rebutted only 'with evidence that the agency's search was not made in good faith.'" *Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) (quoting *Trans. Union LLC v. FTC*, 141 F. Supp. 2d 62, 69 (D.D.C. 2001)). In determining the adequacy of a FOIA search, the Court is guided by principles of reasonableness. *See Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 27 (D.C. Cir. 1998). The Court must also be mindful that an agency is required to produce only those records in its custody and control at the time of the FOIA request. *See McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983). However, summary judgment is inappropriate "if a review of the record raises substantial doubt" about the adequacy of the search. *Valencia-Lucena*, 180 F.3d at 326 (citing *Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979)).

A *pro se* complaint is held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). However, any leeway does not extend to the evidence required at summary judgment, as courts hold *pro se* plaintiffs to the same evidentiary burdens and presumptions as represented plaintiffs. *See Prunté v. Universal Music Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011).

## IV. ANALYSIS

Upon consideration of the parties' submissions—HHS's motion for partial summary judgment, Wright's cross-motion, and the accompanying briefs—the Court identifies two

principal issues that warrant resolution.[1]  First, the Court must determine whether HHS

conducted a search that was reasonably calculated to uncover all records responsive to Wright's

FOIA request, including Items 3 and 4 of that request.  Second, the Court must address whether

Wright is entitled to compel HHS to search the personal email accounts of its employees for

responsive documents.  The Court will address each of these issues in turn.

## A. Adequacy of HHS's Search

In response to HHS's assertion that it conducted an adequate search for responsive

records, Wright offers three arguments that HHS's search for records in response to his request

was inadequate.  First, according to Wright, HHS's search was not reasonably calculated to

locate key records, failed to include all likely repositories for responsive records, and did not

adequately describe or search relevant record systems.  Pl.'s Cross-Mot. for Partial Summ. J. &

Mem. in Supp. Thereof ("Pl.'s Mot.") at 11–25, ECF No. 40; Pl.'s Reply in Supp. of His Cross-

Mot. for Partial Summ. J. & in Opp'n to Def.'s Mot. for Partial Summ. J. ("Pl.'s Reply") at 5–11,

ECF No. 45.  Second, Wright argues that HHS's search for Item 3 of his request was not

adequate.  Pl.'s Mot. at 26–27; Pl.'s Reply at 12–14.  Lastly, Wright contends that HHS failed to

search for all likely repositories for Item 4 and that a further search for it should not be stayed.

Pl.'s Mot. at 27–28; Pl.'s Reply at 14.  Wright argues that because HHS identified 1,632

---

[1] The Court grants summary judgment to HHS on its withholdings under FOIA
Exemptions 5 and 6 because Wright does not contest these withholdings in any meaningful way.
*See* Pl.'s Mot. at 28–29 (asserting that HHS's arguments regarding withholdings and
segregability are "completely irrelevant" and stating that Wright "did not ask for" any
predecisional materials).  Wright does not challenge HHS's invocation of Exemption 6 at all.
*See generally id*.  Because Wright has effectively waived any objection to these withholdings,
and because HHS's justifications for withholding the materials under FOIA Exemptions 5 and 6
are adequately supported by the agency, *see* Def.'s Mot. for Partial Summ. J. & Mem. in Supp.
Thereof ("Def.'s Mot.") at 9–16, ECF No. 38, summary judgment in HHS's favor is appropriate
with respect to the withholdings under FOIA Exemptions 5 and 6.

potentially responsive pages containing the word "proposal" but released only twenty-five pages—none of which included the word—the agency's failure to produce more responsive records can only be explained by an inadequate search. *See* Pl.'s Mot. at 4.

"FOIA requires government agencies to describe their searches in enough detail for a court to determine whether the search was sufficiently exhaustive to satisfy the Act." *Sennett v. U.S. Dep't of Just.*, 962 F. Supp. 2d 270, 277 (D.D.C. 2013). "A requester dissatisfied with the agency's response that no records have been found may challenge the adequacy of the agency's search by filing a lawsuit in the district court after exhausting any administrative remedies." *Valencia-Lucena*, 180 F.3d at 326. To prevail on summary judgment, "the agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotations and citations omitted). An agency must search for documents in good faith, using methods that are reasonably expected to produce the requested information. *See Valencia-Lucena*, 180 F.3d at 326 (citing *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). The principal issue is not whether the agency's search uncovered responsive documents, but whether the search was reasonable. *See Oglesby*, 920 F.2d at 67 n.13 (citing *Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C. Cir. 1986)); *see also Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996). The agency need not search every record in the system or conduct a perfect search. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *Meeropol*, 790 F.2d at 952, 956. Nor need the agency produce a document if "the agency is no longer in possession of the document[] for a reason that is not itself suspect." *SafeCard Servs.*, 926 F.2d at 1201. Instead, to demonstrate reasonableness, the agency must set forth sufficient information in affidavits for the court to determine, based on the facts of the case, that

the search was reasonable. *Nation Magazine*, 71 F.3d at 890 (citing *Oglesby*, 920 F.2d at 68).

While an agency's affidavits are presumed to be in good faith, a plaintiff can rebut this

presumption with evidence of bad faith. *SafeCard Servs.*, 926 F.2d at 1200. But such evidence

cannot be comprised of "purely speculative claims about the existence and discoverability of

other documents." *Id.* If the record raises substantial doubts regarding the agency's efforts,

"particularly in view of well-defined requests and positive indications of overlooked materials,"

summary judgment is not appropriate. *Valencia-Lucena*, 180 F.3d at 326 (citation modified)

(internal quotations and citations omitted).

### 1. Search Efforts to Locate Key Records

As a preliminary matter, HHS argues that it conducted a reasonable and thorough search

for responsive records to Wright's FOIA request concerning COVID-19 adverse reactions in the

Vaccine Reporting System. Def.'s Mot. Partial Summ. J. & Mem. in Supp. Thereof ("Def.'s

Mot.") at 6–8, ECF No. 38. HHS explains that it employed targeted email searches with specific

terms and consulted relevant offices and experts, including the CDC's ISO, to identify

potentially responsive records. Def.'s Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot.

Summ. J. ("Def.'s Reply") at 3–5, ECF No. 44. It maintains that the adequacy of the search is

determined by the reasonableness of the methods used, not by the volume of records found. *Id.*

HHS asserts that Wright must provide evidence of an inadequate search, rather than speculating

about additional documents. *Id.* at 5.

In response, Wright contends that HHS conducted a deliberately inadequate FOIA search

by using vague and irrelevant search terms such as "proposal" and "concept" instead of more

precise ones like "vaccine," "safety," "adverse reactions," or "study." Pl.'s Mot. at 11–12. He

argues that the agency failed to explain its search methodology, neglected to consult subject-

matter experts, and ignored essential record sources such as paper files, shared drives, and encrypted communications.  *Id*. at 13–15.  According to Wright, HHS also excluded communications with key individuals, including Anthony Fauci and other decision-makers, and failed to search for interactions with other government agencies, foreign governments, and social media platforms concerning vaccine safety and censorship.  *Id*. at 21–26.  He asserts that these omissions violated FOIA's legal standards and reflected a deliberate effort to avoid locating responsive documents.  *Id*.  Wright emphasizes that his challenge focuses not on the quantity of records produced but on the flawed and unjustified search strategy, which failed to meet established legal and procedural expectations.  Pl.'s Reply at 6–9, 10–11.

The Court finds that HHS's search efforts to locate key records was adequate.  As established under *Oglesby*, an agency meets its burden in demonstrating the adequacy of a FOIA search when it submits affidavits that are reasonably detailed, non-conclusory, and in good faith, describing the scope and method of the search.  920 F.2d at 68.  The declarations submitted by both the CDC (through Roger Andoh) and HHS (through Alesia Williams) satisfy these requirements and collectively demonstrate that the agency's search was reasonably calculated to uncover all relevant documents responsive to Wright's request.  *See* Andoh Decl. ¶¶ 7, 23–25; *see also* Williams Decl. at 3.

The Court will begin by detailing an overview of what specifically was done in response to Wright's FOIA request, outlining the agency's step-by-step efforts to identify, interpret, and locate responsive records across its various offices before and after Wright's motion to compel. In response to Item 1 of Wright's FOIA request, the CDC FOIA Office initially reported that no responsive records were found, clarifying that the ISO does not create "decision memos" as described in the request.  *See* Andoh Decl. ¶ 11.  Instead, they provided links to the CDC's

Standard Operating Procedures related to COVID-19 and to vaccine safety studies. *Id.* These results were communicated on February 22, 2022, and again in the March 8, 2022 interim response. *Id.* ¶¶ 8, 10. On July 17, 2023, Wright filed a motion to compel, arguing that a proper search should include HHS communications with various government agencies, social media platforms, international organizations, and third parties involved in what Wright characterized as COVID-19 "censorship." *Id.* ¶¶ 20–21. However, the CDC FOIA Office rejected this expanded scope, explaining that it did not reasonably describe the records actually sought under Item 1, which focused on follow-up studies related to VAERS COVID vaccine adverse reaction reports. *Id.* ¶¶ 21–22. The FOIA Office further explained that the proposed scope instead targeted unrelated issues and would be unduly burdensome given the volume and irrelevance of the records involved. *Id.* ¶ 22.

As a result, the CDC FOIA Office sent Item 1 and the motion to compel back to ISO for assistance in defining a more focused search. *Id.* ¶ 23. On December 22, 2023, ISO advised conducting an enterprise search of Dr. John Su's Microsoft Outlook account using the following search terms: "Concept proposals and COVID-19 and VAERS," "Concept proposal, COVID, and VAERS," and "Proposal, COVID, and VAERS." *Id.* ISO clarified that it does not use the term "decision memos." *Id.* Dr. Su was identified as the VAERS team lead and Deputy Director of ISO, and thus likely to have been involved or copied on any relevant correspondence. *Id.* ¶ 24. In parallel, the CDC FOIA Office asked the National Center for Immunity and Respiratory Diseases ("NCIRD"), specifically the Coronavirus and Other Respiratory Viruses Division ("CORVD"), to search for related records. *Id.* ¶ 25. Dr. John Brooks and Incident Manager Brendan Jackson conducted manual searches of Outlook and shared drives for documents

relating to follow-up VAERS studies, but no responsive records were found. *Id*. NCIRD reiterated that ISO was the most appropriate office for such records. *Id*.

For Item 2, ISO conducted a search and confirmed that all COVID-19 vaccine studies conducted by the office were publicly available online. *Id*. ¶ 12. In its February 22 and March 8, 2022 responses, ISO and the CDC FOIA Office provided a link to those studies hosted on the CDC's website. *Id*. ¶¶ 8, 10, 12. ISO specified that all of its COVID-19 vaccine research could be accessed through the CDC's vaccine safety research publications page. *Id*. ¶ 12.

Item 3 was initially rejected by both ISO and the CDC FOIA Office for being overly broad and unduly burdensome. *Id*. ¶ 8. The agencies explained they could not determine precisely what records Wright was seeking and asked for clarification. *Id*. ¶¶ 8, 10, 13. On April 4, 2022, Wright submitted a 40-page letter narrowing the scope of Item 3 to request records created after any decision memos, specifically those discussing or analyzing mortality as an adverse reaction to COVID-19 vaccines, using search terms such as "death," "died," "killing," and "murder." *Id*. ¶¶ 17–18. The CDC FOIA Office accepted this revised scope and, on April 7, 2022, issued a scope memorialization letter formally defining the parameters of the search. *Id*. ¶ 18. Ultimately, on September 22, 2022, the CDC FOIA Office provided public links that were responsive to Item 3 under the newly defined terms. *Id*. ¶ 19.

Lastly, in response to Item 4, the CDC FOIA Office conducted a search using the FOIA mailbox for the National Center for Emerging and Zoonotic Infectious Diseases ("NCEZID"), which archives all document requests. *Id*. ¶ 14. The office identified similar FOIA requests related to COVID-19 and located 13 responsive documents. These were released to Wright as part of the March 8, 2022 interim response. *Id*. ¶¶ 10, 14.

HHS's search methodology aligns with legal standards articulated in *Valencia-Lucena*, 180 F.3d at 325–26, which holds that a search is adequate if it is conducted in good faith and targets the record systems most likely to contain the requested information.  HHS, through the CDC's ISO—a component specifically tasked with vaccine safety—conducted its initial searches in the office most likely to hold responsive documents.  Def.'s Mot. at 7–8; Def.'s Reply at 3–4.  This included searching the Outlook account of Dr. John Su, a senior official directly involved in VAERS-related decisions, using search terms like "concept proposal," "COVID," and "VAERS."  Def.'s Mot. at 3; Def.'s Reply at 3–4.  As courts in this district have recognized, agencies are not required to search every conceivable record system or conduct a perfect search, *see, e.g.*, *SafeCard*, 926 F.2d at 1201; rather, they must demonstrate a logical and reasonable approach under the circumstances, which HHS has done.

Moreover, the supplemental efforts undertaken by HHS in response to Wright's motion to compel further support the adequacy of its search.  As described in the Williams Declaration, HHS extended the search beyond the CDC to the Office of the Secretary, including high-level officials such as the Secretary, Deputy Secretary, and Chief of Staff.  Def.'s Reply at 4–5.  The search used a targeted combination of keywords—"proposal AND COVID AND VAERS"—to locate any policy-related or planning documents that might reflect decision-making or further study initiatives on COVID-19 vaccine adverse reactions.  Def.'s Mot. at 4.  This action shows not only responsiveness to Wright's concerns, but it also reflects the kind of "flexible and targeted searches" described in *Kowal v. U.S. Dep't of Just.*, 107 F.4th 1018, 1028–29 (D.C. Cir. 2024) ("Agencies have the discretion to construe requests reasonably and conduct flexible and targeted searches within their internal records systems.  Agencies do not need to honor unreasonably burdensome requests, boiling the ocean in search of responsive records.").

Additionally, HHS's collaboration with subject-matter experts (*e.g.*, the ISO) to formulate appropriate search parameters mirrors the reasoning in *Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 168 (D.D.C. 2016), where the court held that an agency's reliance on experts to define search terms demonstrated a reasonable and effective methodology. The fact that the CDC and HHS opted for broader terms such as "proposal" or "concept proposal" is not evidence of evasion, but rather reflects their judgment, as those terms are likely to encompass internal planning and preliminary documents that Wright described in his FOIA request. The CDC FOIA Office's decision to involve the ISO—specifically Dr. John Su, the VAERS team lead and Deputy Director of ISO—ensured that the search was guided by personnel with direct knowledge of the relevant subject matter. *See* Andoh Decl. ¶ 24. ISO's recommendation to use search strings such as "Concept proposals and COVID-19 and VAERS," "Concept proposal, COVID, and VAERS," and "Proposal, COVID, and VAERS" was rooted in its understanding of how internal discussions about follow-up studies are typically documented and labeled within the agency. *Id*. ¶ 23. This tailored approach was also a direct response to Wright's request under Item 1, which sought records related to follow-up studies on adverse events reported to VAERS. While Wright initially used the phrase "decision memos," ISO clarified that such terminology is not standard within their documentation processes. *Id*. ¶ 23. Instead, terms like "concept proposals" were more likely to capture the kinds of preliminary planning and internal evaluations that Wright was seeking. This choice reflects the agency's attempt to interpret the request in a manner that would yield responsive records without conducting an overly broad or speculative search—an approach consistent with FOIA's requirement that agencies conduct searches "reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68.

Furthermore, the agency's rejection of Wright's expanded request to include communications with other government agencies and third parties as unrelated and unduly burdensome underscores that the chosen search terms were carefully limited to records directly responsive to Item 1's focus on VAERS follow-up studies. *See* Andoh Decl. ¶¶ 21–22. The agency's explanation that this expanded scope targeted "unrelated issues" and would likely generate a high volume of irrelevant documents further supports the reasonableness of their more narrowly tailored search strategy. *Id.* ¶ 22; *see also Steinberg v. U.S. Dep't of Just.*, 23 F.3d 548, 552 (D.C. Cir. 1994) (holding that in order for the agency to establish the adequacy of its search, it must "describe in . . . detail what records were searched, by whom, and through what process"); *Oglesby*, 920 F.2d at 68 ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed . . . is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search."). By engaging with subject-matter experts, relying on their domain-specific knowledge to craft search terms, and clearly aligning those terms with the language and intent of the original FOIA request, the CDC and HHS demonstrated a diligent, good-faith effort to comply with FOIA's requirements.

Critically, Wright's objections—though strongly worded—do not rise to the level of evidence required to rebut the presumption of good faith accorded to agency declarations. Under *SafeCard*, 926 F.2d at 1200–01, mere speculation about the existence of additional records or dissatisfaction with the results of a search is insufficient to challenge the adequacy of that search. *See also Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) (holding that "the agency's failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records"). Here, Wright fails to provide concrete evidence suggesting that specific,

known documents were omitted or that the agency acted in bad faith.  Instead, he argues that

HHS acted in bad faith by failing to produce any substantive records over a three-year period in

response to a FOIA request, which he contends reflects a broader institutional culture of secrecy.

Pl.'s Mot. at 4.  Wright cites to reports and congressional findings that he claims demonstrates

that high-level HHS officials—including Dr. David Morens and potentially Dr. Anthony Fauci—

intentionally evaded FOIA requirements by deleting emails, using personal accounts for official

business, and receiving coaching from FOIA personnel on how to subvert the law.  *Id*. at 5–7.

He argues that these deliberate efforts to conceal records related to COVID-19 suggest a

systemic intent to undermine transparency, and HHS's conduct should be viewed through the

lens of a demonstrated pattern of bad faith.  *Id*.

 However, even taking Wright's assertions at face value, his argument ultimately falters

because it lacks the evidentiary weight needed to establish a genuine dispute of material fact.

His references to alternative search terms, omitted individuals, or unsearched storage mediums

are too speculative to create a genuine dispute of material fact, especially in the absence of proof

that such records exist or are reasonably expected to exist in the omitted locations.  Of note, there

is a tension at the core of Wright's position that further undermines his claims: the premise of his

FOIA request is that the studies he seeks—particularly those related to vaccine safety and

adverse reactions—were never conducted.  *Id*. at 18 ("Item 2 asks for studies (including

unpublished studies) of adverse reactions to COVID vaccines, not limited to VAERS reports.

The Defendant's Position statements set forth above are silent with respect to the types of studies

the Defendant may have considered.  There are several kinds of studies that could be performed

on VAERS and other dataset adverse reaction reports.").  Given that his own request is based on

the assumption that such records may not exist, it is somewhat puzzling that he is so surprised

when records concerning such studies are not found.  In short, Wright cannot have it both ways—arguing on the one hand that HHS failed to conduct critical studies, while on the other hand treating the absence of records as evidence of a flawed or incomplete search.

Ultimately, this Court's finding is consistent with the guiding principle from *Dillon v. U.S. Dep't of Just.*, No. 17-cv-1716, 2019 WL 249580, at *5 (D.D.C. Jan. 17, 2019) that FOIA "does not require that the agency search every record system" or use the requestor's preferred search terms.  Instead, it allows agencies discretion in crafting reasonable and targeted searches. *Agility Pub. Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) ("Federal agencies have discretion in crafting a list of search terms that they believe to be reasonably tailored to uncover documents responsive to the FOIA request.  Where the search terms are reasonably calculated to lead to responsive documents, the Court should not micro manage the agency's search." (internal quotations and citations omitted)).  The totality of the declarations, search efforts, and responsiveness to the motion to compel support the conclusion that HHS's search met FOIA's standards.  Accordingly, the Court finds that HHS sufficiently demonstrated that its search efforts to locate key records were adequate under the FOIA.

### 2.  Item 3 Search Efforts

Wright also argues that HHS's search for records responsive to Item 3 is inadequate. Pl.'s Mot. 26–27.  Although HHS provided public weblinks, Wright asserts that this does not constitute a thorough search of agency records, as required by law.  *Id*.  He claims that HHS failed to search multiple likely repositories within the agency, such as those containing discussions of COVID vaccine mortality beyond VAERS, including data from the CDC, FDA, Medicare, and other relevant datasets.  *Id*.  Furthermore, Wright claims that HHS's response was limited to certain types of records like death reports and journal articles, which are not

exhaustive of the potential discussions on vaccine mortality. Pl.'s Reply at 12–13. He also contends that no consultations with relevant agency personnel were made, despite legal requirements to do so. Pl.'s Reply at 13–14. HHS counters that its handling of Item 3 of Wright's FOIA request was adequate because the requested records were already publicly available. Def.'s Reply at 5–6. It contends that the adequacy of a FOIA search is not measured by its results, and agencies are not required to search for or reproduce documents that are already accessible through alternative means. *Id*. HHS explains that the CDC directed Wright to web links containing the relevant data and studies, fulfilling its obligation under FOIA. *Id*.

The Court finds that HHS has the better argument. Under settled FOIA precedent, the adequacy of an agency's search is judged by the reasonableness of the search method, not the volume or type of documents produced. *See, e.g.*, *Valencia-Lucena*, 180 F.3d at 326. In this case, HHS—acting through the CDC—conducted a targeted search specifically focused on the revised Item 3 request, which sought records related to mortality as an adverse reaction to COVID-19 vaccines. Def.'s Reply at 5–6. Initially, the CDC FOIA Office and ISO determined that the initial search for Item 3 was overly broad and unduly burdensome, requiring further clarification of the request. *See* Andoh Decl. ¶ 8. As a result, the agencies requested clarification because they could not determine what specific records were being sought. *Id*. ¶¶ 8, 10, 13. In response, Wright narrowed the request to include only records created after any decision memos discussing or analyzing mortality as an adverse reaction to COVID-19 vaccines. *Id*. ¶ 17. He specified search terms such as "death," "died," "killing," and "murder," and the CDC FOIA Office then conducted a targeted search within the ISO and the Coronavirus and Other Respiratory Diseases Division. Def.'s Stmt. ¶¶ 5, 7. This search included both email queries and document reviews across multiple internal systems, including the ISO's deputy

director's Microsoft Outlook account and the agency's records related to VAERS adverse event reports. Andoh Decl. ¶¶ 23–25. The CDC FOIA Office accepted this revised scope, and it further clarified the search parameters to include emails, internal memoranda, and other relevant documents. *Id.* FOIA requires only that an agency conduct a search that is "reasonably calculated to uncover all relevant documents," not one that is exhaustive or infallible. *Nation Magazine*, 71 F.3d at 890 (internal quotation omitted). The declarations submitted by CDC officials, including the Andoh Declaration, demonstrate that the agency conducted a reasonable, appropriately tailored, and adequately documented search in response to the clarified request, thereby satisfying its burden under FOIA. *See* Andoh Decl. ¶¶ 8, 10, 13, 17–19; *see also Oglesby*, 920 F.2d at 68.

Moreover, Wright's objection—that the CDC merely provided public links—is legally unavailing. Courts have consistently held that an agency satisfies its FOIA obligations when it provides requesters with information that is already publicly available, especially when the alternative would be to duplicate materials already accessible. *Tax Analysts v. U.S. Dep't of Just.*, 845 F.2d 1060, 1065–67 (D.C. Cir. 1988). In line with this principle, 45 C.F.R. § 5.1(b) expressly provides that HHS need not reprocess or reproduce records that have already been released or are publicly distributed by its program offices. HHS's redirection to official CDC web pages showing mortality reports and related analyses is fully consistent with this regulation and precedent. Again, an agency is not obligated to "search every record in the system" or locate "a particular document." *SafeCard*, 926 F.2d at 1201. The focus remains on whether the methods used were reasonable and performed in good faith. *Id.*

Wright's argument that HHS failed to search other components such as Medicare or FDA databases also falls short. FOIA does not require agencies to search offices or systems unlikely

to have responsive records, nor does it require cross-agency consultation unless the request clearly implicates those components. *Kowalczyk v. U.S. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996) (finding that the agency is only to "conduct a search reasonably calculated to uncover all relevant documents," that "[t]he agency is not required to speculate about potential leads," and the agency "is not obliged to look beyond the four corners of the request for leads to the location of responsive documents").  Here, the request was directed at the CDC, which the record shows was appropriately identified as the custodian of relevant documents.  Def.'s Stmt. ¶ 2.  HHS further confirmed that the CDC was the proper component to handle this part of the request, and Wright's own revision of Item 3 focused on mortality analyses closely tied to vaccine safety surveillance—precisely the domain of the CDC's ISO.  *See* Andoh Decl. ¶ 17 ("Plaintiff sent a 40-page letter to HHS and CDC FOIA Offices discussing the handling of his FOIA request. In relevant part, Plaintiff narrowed item three of his request.").  Wright's speculation that other components might contain responsive materials does not constitute sufficient evidence of bad faith or of an inadequate search.  "Purely speculative claims about the existence and discoverability of other documents" are not enough to overcome a presumption of good faith attached to agency declarations.  *See Concepción v. FBI*, 606 F. Supp. 2d 14, 26 (D.D.C. 2009).

Finally, courts have made clear that the failure to uncover additional documents—even potentially relevant ones—does not render a search inadequate.  *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used.").  Wright's dissatisfaction with the quantity or type of records produced does not by itself create a genuine dispute of material fact.  *Id*.  In the absence of specific evidence contradicting HHS's

account or demonstrating bad faith, Wright's arguments do not warrant summary judgment. Accordingly, the Court concludes that HHS's handling of Item 3—by identifying the CDC as the proper entity, conducting keyword-based searches, and directing Wright to publicly available responsive records—was reasonable, appropriate, and in line with both FOIA standards and the applicable case law.

### 3. Item 4 Search Efforts

In his final challenge to the adequacy of HHS's search, Wright argues that the agency failed to search all likely repositories for records responsive to FOIA Item 4, which seeks previously released materials. Pl.'s Mot. at 27–28. While the CDC produced 13 pages in response, no other HHS components have provided records, and the FDA is currently excluded from the case due to a stay. *Id*. Wright contends that the HHS Secretary's limited search demonstrates that the full scope of the request remains unaddressed and that other potential repositories within HHS must also be searched. *Id*. He further argues that HHS's position—that further searches should be stayed due to the FDA's involvement—is illogical, as the rest of the case is proceeding without delay. Pl.'s Reply at 14. In response, HHS maintains that its search was reasonable and adequate, emphasizing that the CDC conducted an appropriate search for records responsive to Item 4. Def.'s Reply at 6–7. While Wright argues that other HHS components should have conducted their own searches, HHS notes that the case is stayed with respect to the FDA; and therefore, that issue is not yet ripe for review. *Id*. Moreover, HHS asserts that Wright does not directly challenge the adequacy of the CDC's search and, on that basis, requests summary judgment in its favor regarding the CDC's response to Item 4. *Id*. Again, HHS's argument is more convincing.

The adequacy of HHS's handling of Item 4 is consistent with well-established FOIA precedent in this Circuit.  Plaintiff argues that the CDC's search was incomplete because other HHS components did not conduct independent searches.  However, FOIA does not require perfection or an exhaustive, system-wide search; rather, it mandates a search that is "reasonably calculated to uncover all relevant documents."  *Nation Magazine*, 71 F.3d at 890.  In response to Item 4, the CDC's ISO searched its FOIA inbox and produced thirteen responsive records.  Andoh Decl. ¶ 14.  The agency's search was reasonable because it targeted the most likely source of responsive records—the FOIA mailbox for the NCEZID, which archives all document requests.  *See id.*  By focusing on this centralized and relevant repository, the CDC adopted a logical method designed to uncover documents responsive to the FOIA request.  Furthermore, the identification and release of 13 responsive documents supports the inference that the search was effectively tailored to the request's subject matter.  *Id.*  Even if other HHS components were not independently searched, the CDC's use of its archival FOIA inbox—coupled with the production of relevant materials—demonstrates that the search was reasonably calculated to locate pertinent records, consistent with FOIA obligations.  Again, the adequacy of that search must be evaluated not by its results, but by the reasonableness of the methods used.  *Iturralde*, 315 F.3d at 315.

Here, HHS provided a sworn declaration explaining the scope and methodology of the CDC's search.  *See* Andoh Decl. ¶ 14.  Wright offers no evidence of bad faith or procedural irregularity with respect to the CDC's efforts.  Instead, he speculates that other HHS components may have responsive records, which, under *Concepción*, is insufficient to rebut the presumption of adequacy.  606 F. Supp. 2d at 30.  Moreover, the adequacy of a FOIA search is typically assessed based on the suitability of the search methods employed, rather than the results

produced. *Santana v. U.S. Dep't of Just.*, 828 F. Supp. 2d 204, 209 (D.D.C. 2011). The CDC targeted the office most likely to possess records previously released under similar FOIA requests—its ISO—and searched its internal FOIA inbox, a reasonable method for locating records of past disclosures. *See* Andoh Decl. ¶ 14. This aligns with the principle set forth in *Valencia-Lucena*, where an agency is required to search locations most likely to contain responsive materials but is not obligated to search every division or office absent specific evidence of likely holdings. 180 F.3d at 326.

The CDC has sufficiently demonstrated that its search in response to Item 4 meets FOIA's reasonableness requirement.[2] Without concrete evidence of bad faith, and given that Wright does not directly challenge the CDC's search methodology, the agency has satisfied its burden under *Oglesby*. Accordingly, the Court also grants summary judgment in favor of HHS as to Item 4 of Wright's FOIA request.

### B. Search of Personal Email Accounts

In addition to challenging the adequacy of HHS's search, Wright argues that the personal email accounts of HHS employees should be subject to FOIA, citing a congressional staff memo indicating that HHS employees used personal email for COVID-related government business, which he refers to as the FOIA scandal. Pl.'s Mot. at 28. HHS argues that Wright's demand for a search of personal email accounts is unsupported because the FOIA request does not specify any private account or official likely to possess relevant records, and merely citing a general FOIA scandal is insufficient to justify such a search. *See* Def.'s Reply at 7–8. HHS contends

---

[2] The question of whether the FDA should have conducted parallel searches is not currently ripe due to the stay in place with respect to the FDA. The Court appropriately refrains from opining on the adequacy of future or stayed searches. *See Simon v. U.S. Dep't of Just.*, No. 16-cv-671, 2017 WL 1495915, at *1 (D.D.C. Apr. 26, 2017) (deciding not to presume the agency's search was inadequate since the search efforts were still ongoing).

that Wright fails to identify specific accounts or evidence of agency control over such emails.  *Id.*
In response, Wright asserts that he specifically referenced the HHS Secretary, *see* Pl.'s Mot. at
28, and argues that the FOIA scandal is directly relevant to this litigation because it involves
many of the same individuals connected to the COVID-19 vaccine matters at issue here (*e.g.*,
David Morens and Anthony S. Fauci).  Pl.'s Reply at 15.  Anthony Fauci was the Director of the
National Institute of Allergy and Infectious Diseases ("NIAID") at the National Institutes of
Health ("NIH"), and David Morens was his Senior Scientific Advisor, also at the NIAID.

This Circuit has made clear that "agency records"—even those stored on a personal email
account—are subject to FOIA.  *See Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827
F.3d 145, 149 (D.C. Cir. 2016).  Nonetheless, courts presume that agency records are unlikely to
be found solely on personal email accounts, since federal law and regulations prohibit officials
from using them for official business without forwarding to or copying their official account.
*Judicial Watch, Inc. v. U.S. Dep't of Just.*, 319 F. Supp. 3d 431, 437–38 (D.D.C. 2018) (internal
citations omitted); *see also Democracy Forward Found. v. U.S. Dep't of Com.*, 474 F. Supp. 3d
69, 74 (D.D.C. 2020); 44 U.S.C. § 2911(a).  A plaintiff can overcome this presumption with
evidence that "rebut[s] agency affidavits with something more than pure speculation."
*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 241 F. Supp. 3d 14, 22 (D.D.C. 2017)
(internal quotation omitted).

This Court finds that HHS has met its burden of demonstrating an adequate search, and
Wright has failed to provide non-speculative evidence that individuals at HHS used private
emails to conduct public business.  Under FOIA, an agency is required to conduct a "reasonable
search" for records responsive to a request, which involves a search "reasonably calculated to
uncover all relevant documents."  *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C.

Cir. 1983). The adequacy of an agency's search is determined by the method employed and

whether the agency has reasonably conducted a search given the nature of the request. *Id.* The

agency bears the burden of proving that its search was adequate, and this can be met by

providing declarations or affidavits that describe the search process in sufficient detail. *See, e.g.*,

*Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). The D.C. Circuit has

clarified that the search need not be perfect, but it must be "reasonably calculated" to uncover all

relevant documents. *Nation Magazine*, 71 F.3d at 890.

     In this case, HHS has provided detailed declarations, including those of Williams and

Andoh, that explain the specific search terms used and the process employed to identify

documents responsive to Wright's request. *See* Andoh Decl. ¶¶ 7, 23–25; *see also* Williams

Decl. at 3. HHS conducted a targeted email search for high-level officials within the Office of

the Secretary, including the Secretary, Deputy Secretary, and Chief of Staff. Williams Decl. at

3–4; Def.'s Stmt. ¶¶ 10–12. It is undisputed that this search resulted in the identification of over

1,600 records, from which twenty-five pages of documents were deemed responsive and released

to Wright in full. *Id.* The declaration further explains the limited number of responsive

documents, demonstrating that the search was both thorough and appropriately targeted to

capture all potentially relevant materials without compromising any confidentiality concerns.

*See* Andoh Decl. ¶ 29 (explaining the CDC's withholding of draft documents under the

deliberative process privilege to protect internal discussions, preserve the integrity of ongoing

decision-making, and prevent public confusion or misinterpretation of preliminary, non-final

information).

     Wright's argument that personal email accounts of HHS officials must be searched is

unpersuasive, as he has not identified any individual in the Office of the Secretary who used a

personal email account for official business.  Although he references Dr. Anthony Fauci and Dr. David Morens in connection with the alleged FOIA scandal, both individuals were employed at the NIH specifically within the NIAID and were not part of the Office of the Secretary.  Wright offers no evidence—beyond generalized assertions and media reports—indicating that any employee in the Office of the Secretary used personal email accounts to conduct official government business.  *See* Pl.'s Reply at 5–7.

Under applicable D.C. Circuit precedent, an agency's obligation to search personal email accounts arises only where there is concrete, non-speculative evidence that such accounts were used to store agency records.  *See Competitive Enter. Inst.*, 827 F.3d at 149; *Judicial Watch*, 319 F. Supp. 3d at 437–38.  Again, courts in this Circuit have emphasized that mere conjecture or suspicion of improper recordkeeping practices does not meet the evidentiary threshold required to compel a personal email search under FOIA.  *See Competitive Enter. Inst.*, 241 F. Supp. 3d at 22.  Here, the Court finds that Wright has not presented such evidence.  Absent any credible indication that individuals within the Office of the Secretary used private email accounts to store or transmit responsive records, HHS was not required to search such accounts.  Given the lack of evidence implicating officials in the Secretary's office—who were the subject of the FOIA search—the agency's decision to limit its search to official email systems was reasonable.  The agency's actions align with established precedent confirming that a search is adequate when conducted in good faith, using methods reasonably calculated to uncover responsive records within the systems likely to contain them.  *See Ground Saucer Watch*, 692 F.2d at 771; *Weisberg*, 705 F.2d at 1351.

Wright's claim that HHS should have conducted a search of personal email accounts is not supported by a sufficient factual basis.  While Wright points to a broader FOIA scandal involving

personal email use, this argument is speculative and does not establish a concrete basis for requiring a search of personal accounts in this case. The D.C. Circuit is clear that personal email accounts are subject to FOIA only when the agency has control over the records stored in those accounts and when the records themselves are agency documents. *Competitive Enter. Inst.*, 827 F.3d at 149. The court in *Landmark Legal Found. v. EPA* emphasized that "purely speculative" allegations are insufficient. 959 F. Supp. 2d 175, 182 (D.D.C. 2013). Thus, a requester must point to a specific account or source likely to contains responsive records, rather than relying on generalized claims or media reports to justify a search. *Id.* Wright does not point to any instances of personal e-mail use for agency business by any specific HHS official or email account that is likely to contain responsive records. Instead, Wright broadly alludes to allegations of misconduct without offering any evidence that the same individuals were involved, nor does he provide support for the claim that any relevant communications regarding the vaccine studies occurred through personal email accounts. Without more than speculation, this is insufficient to justify a search of personal email accounts.

Moreover, this Circuit presumes that government employees have properly complied with regulations requiring the forwarding of official business emails from personal accounts to official accounts. *See Judicial Watch*, 319 F. Supp. 3d at 437–38; *see also Wright v. Admin. for Child. & Fams.*, No. 15-cv-218, 2016 WL 5922293, at *8 (D.D.C. 2016) ("In view of this requirement, the presumption applies that agency employees comply with applicable law and, consequently, that agency records responsive to a FOIA request would unlikely be located solely in their personal email accounts, rendering a search of those accounts unnecessary."). Absent concrete evidence that an employee deemed likely to possess responsive records did not forward communications or otherwise circumvented agency policy, the Court presumes that the search of

26

official email accounts, which has already yielded responsive records, is sufficient. Wright's reliance on media reports and general allegations of a FOIA scandal involving individuals that are not likely to maintain responsive records fails to meet the higher evidentiary threshold required to compel a search of personal email accounts.

Furthermore, Wright's attempt to draw a direct connection between the broader FOIA scandal and the current case is unavailing. General allegations of past misconduct cannot be used to justify expansive or speculative searches. *See, e.g., Maryland v. U.S. Dep't of Veteran Affs.*, No. 14-cv-1318, 2014 WL 12789621, at *2 (D.D.C. Sept. 30, 2014) (finding that allegations of bad faith in a separate case did not prove bad faith in the current litigation). Here, HHS has shown that its search was both diligent and adequate, and Wright's generalized claims fail to cast doubt on the thoroughness of that search. Wright has not met the burden of demonstrating that additional records likely exist in personal e-mail accounts beyond what has already been produced from official agency e-mail accounts.

HHS's actions satisfy the legal standards for an adequate FOIA search. The agency has made reasonable efforts to search for documents, including the use of specific search terms and inquiries to relevant custodians. Wright's speculative claims about personal email accounts, based on media reports and generalized allegations involving other individuals, do not provide a sufficient factual basis to compel further searches from the private e-mail accounts of the different individuals at issue here. Therefore, the Court finds that Wright has failed to show that HHS's search was inadequate and that a search of personal email accounts is necessary to comply with his FOIA request, and summary judgment is granted in favor of HHS.

## V.  CONCLUSION

For the foregoing reasons, HHS's motion for partial summary judgment is **GRANTED** and Wright's cross-motion for partial summary judgment is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 14, 2025                                             RUDOLPH CONTRERAS
                                                                 United States District Judge